1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3
   _____
      CIF LICENSING, LLC,
 4                 Plaintiff,          )
                                       )  Civ. No.
 5         v.                          )  07-170-JJF
                                       )
 6    AGERE SYSTEMS, INC.,             )
                   Defendant.          )
 7   _____

 8                       MONDAY, SEPTEMBER 21, 2009
                         3:35 p.m.
 9                       Courtroom 4B
                         Suppression Hearing
10
                         844 King Street
11                       Wilmington, Delaware

12    BEFORE:   THE HONORABLE JOSEPH J. FARNAN, JR.,
                United States District Court Judge
13
      APPEARANCES:
14
                   POTTER, ANDERSON & CORROON, LLP
15                 BY:  PHILIP A. ROVNER, ESQ.

16                      -and-

17                 McDERMOTT, WILL & EMERY
                   BY:  MICHAEL CONNOLLY, ESQ.
18                          Counsel for Plaintiff

19                 YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
                   BY:  JEFFREY THOMAS CASTELLANO, ESQ.
20
                        -and-
21
                   TOWNSEND, TOWNSEND, AND CREW, LLP
22                 BY:  DANIEL S. YOUNG, ESQ.

23                      -and-
                   LSI CORPORATION
24                 BY:  MARIE MacNICHOL, ESQ.
                            Counsel for Defendant
```

2

```
1                    THE CLERK:  All rise.

2                    THE COURT:  Good afternoon.  Be

3     seated, please.  Do you want to announce your

4     appearances?

5                    MR. ROVNER:  Good afternoon, Your

6     Honor.  Phil Rovner from Potter, Anderson, and

7     Corroon for Plaintiff GE Licensing.  With me is

8     Mike Connolly from McDermott, Will, and Emery.

9                    THE COURT:  Good afternoon.

10                   MR. CASTELLANO:  Good afternoon,

11    Your Honor.  Jeff Castellano from Young,

12    Conaway, Stargatt, and Taylor for Defendant

13    Agere Systems.

14                   With me at Counsel table are Dan

15    Young from Townsend, Townsend, and Crew.

16                   MR. YOUNG:  Good afternoon, Your

17    Honor.

18                   THE COURT:  Good afternoon.

19                   MR. CASTELLANO:  And Marie

20    MacNichol from the client, and behind them are

21    Dwight Kempf and Surinder Rai, also from LSI,

22    formerly Agere.

23                   THE COURT:  Good afternoon.

24                   All right.  We have received --
```

```
1     clerk of the court received, as you know, a
2     letter request from a Lindsey Bonner from
3     Westlaw Court Express in Washington, D.C., and
4     the letter request sets forth a request for
5     trial exhibits that were admitted into evidence
6     during the February 2009 trial, and I have
7     received letters from the parties setting forth
8     their position, and I thought it would be
9     helpful if I got you folks in to have a
10    discussion about this request.
11                    As you know, in this Circuit there
12    are cases that talk about once a trial
13    commences, that the trial record, including
14    exhibits, is a matter of public record, and
15    there is some language in those cases that sets
16    a pretty strict standard for when a trial court
17    or district court would not allow exhibits to be
18    in the public record.
19                    So I thought it would be helpful
20    if you made some record of the -- not of each
21    one, but at least representatively -- of the
22    exhibits asked for, and I have the opportunity
23    to answer some questions.
24                    So who wants to go first because
```

```
 1    there's Plaintiffs and Defendant's exhibits, and
 2    I have letters from third parties, I think.
 3    Motorola.
 4                Do you want to start?
 5                MR. CONNOLLY:  Certainly, Your
 6    Honor.  Michael Connolly for Plaintiff GE
 7    Licensing.
 8                The documents that we noted in our
 9    letter that we are objecting to fall into a few
10    different categories.
11                One is, kind of, internal
12    organizational documents.  There's the JTX 21,
13    the limited liability company agreement of CIF
14    Licensing.  This was marked "Confidential.
15    Outside attorney's eyes only."  It was
16    tangentially referred to in trial.
17                Just to be clear, anything that's
18    on the trial record we're not trying to stuff
19    back in the bottle on any of these documents.
20    The portions were read.  If they were discussed,
21    that's in the public record.  We're just talking
22    about the documents themselves.
23                And in that case there's a
24    particularized harm that comes from how GE and
```

```
 1      CIF have internally structured their
 2      organization, is the type of document that's
 3      given protection.  It's a highly sensitive
 4      internal document that sets forth ownership and
 5      the general purpose of CF Licensing.
 6                    There's also a group of
 7      Motorola-related documents, and, as you've
 8      mentioned, you got a letter from Motorola
 9      expressing their opinion, which is in agreement
10      with Agere and GE, that these documents should
11      not be made public.
12                    THE COURT:  Let me ask this
13      question:  Can we all agree, when you read the
14      rule, that a nonparty -- essentially a witness
15      -- has a much lower threshold when documents
16      they've produced are utilized to establish
17      protection --
18                    MR. CONNOLLY:  Lower threshold to
19      establish protection.
20                    THE COURT:  -- or do you think you
21      have the same balance of the standard?
22                    MR. CONNOLLY:  That sounds right.
23      I think in that case, you know, stepping through
24      it, a third party produces documents under the
```

```
 1    protective order and thereafter assumes that
 2    that protective order is going to be held by its
 3    terms, whether trial or before trial.
 4              So when you produce something as a
 5    third party under a confidentiality setting that
 6    says it's going to remain in the public eye, I
 7    think that third party certainly has a right to
 8    expect it keeps out of the public eye.  Even if
 9    something happens that puts it in, it's not
10    their fault or to their detriment.
11              Here, where you're being asked to
12    put them in the public eye, I think you're
13    right.  The sequence in this particular case,
14    Motorola certainly expected those things to
15    remain confidential.
16              Now I'm going argue for Motorola
17    but --
18              THE COURT:  Does the rule say
19    anything when you get stuff in discovery from
20    third parties?  I mean, absent a specific
21    agreement.  Do you know?
22              MR. CONNOLLY:  I don't know, Your
23    Honor.  I do know that everything we're
24    discussing here today was received under the
```

7

```
 1      protective order and marked under it, so to the

 2      extent that that takes precedence --

 3                    THE COURT:  All right.  Let me

 4      just take a look here.

 5                    Okay.  Go ahead.

 6                    MR. CONNOLLY:  Just move ahead?

 7                    THE COURT:  Move ahead, and I'll

 8      --

 9                    MR. CONNOLLY:  Sure.

10                    The JTX 33, JTX 35 that have been

11      requested were both Motorola-produced documents,

12      again, marked "Confidential.  Attorney's eyes

13      only."

14                    JTX 35 may also contain another

15      third party's confidential information,

16              all, again, which were produced under

17      the protective order and treated by all parties

18      as confidential up to this day.

19                    And then the next group of

20      documents, which are GE's highly sensitive

21      internal documents describing

22

23

24
```

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697   FAX (302) 658-8418

```
 1     ████████████████
 2              I think while who was requesting
 3     these documents may or may not matter, it does
 4     help with the particularized harm and context.
 5     ████████████████████████████       The
 6     pattern of the requests clearly indicate some
 7     type of competitive interest in the license
 8     rates being charged, the particular sales of
 9     Agere.
10              And what that goes to is that it's
11     clearly information that is highly confidential
12     but also highly valuable to someone in a
13     competitive position, in a position of needing a
14     license to get the inside track on information
15     that they would otherwise have no possible
16     access to, and so they make this request and try
17     to get it through other means.
18              The harm that that would bring is
19     a direct business harm to GE, and it is, I
20     think, in line, direct line, with prior cases
21     which have protected that same type of
22     information, and that would include:  DX 167, DX
23     180, DX 183, DX 184, DX 286, DX 287, DX 288, DX
24     290, DX 291, and PPX 188.
```

9

```
1                 And that completes the documents
2      that GE has noted off the list as -- that should
3      not be disclosed.
4                 So they generally fit into those
5      three categories, and I think there's a
6      particularized harm for each one, each document
7      individually and along those categorical lines.
8                 THE COURT:  With the governing
9      document, is it the case that that's available
10     someplace else publicly?
11                MR. CONNOLLY:  It's my
12     understanding that it's not, Your Honor --
13                THE COURT:  And --
14                MR. CONNOLLY:  -- and we certainly
15     never treated it that way.  It's been treated by
16     all parties as confidential since it's been
17     produced.
18                THE COURT:  What's in the
19     governing document, such as the purpose of the
20     entity, isn't available anywhere else?
21                MR. CONNOLLY:  Well, you know, we
22     could -- I guess we could go through the
23     document and identify whether certain sections
24     or what they embody may be available publicly,
```

1    but certainly there are -- there are going to be

2    things that are not that may include the

3    purpose.  I'm not certain.

4                    But the document as a whole

5    certainly encompasses the particular structure,

6    corporate structure, of CIF Licensing, the

7    licensing entity that owns these patents.

8                    Again I think the particularized

9    harm comes into focus when you think about a

10   competitor or potential licensee.  If they had a

11   wish list that they could know about someone who

12   is licensing patents, this is the wish list:

13   How is the company structured?  Who am I dealing

14   with?  What do they charge other licensees?

15   What are the licensees' exact sales?  That sort

16   of thing.

17                   And I think all of those would be

18   harmful, and that includes the operating

19   agreement which sets forth exactly how CIF

20   licensing is structured from a corporate

21   standpoint.

22                   THE COURT:  You mentioned it, but

23   the requesting party.  Is that some agent?

24                   MR. CONNOLLY:  It's my

```
 1      understanding it's Westlaw Court Link.  Someone
 2      can pay a fee and have them obtain court
 3      documents.  I think we probably do.  Usually
 4      it's a transcript or something else where we
 5      need some personal service.
 6                    In this case we don't know who the
 7      actual requester is because it's somebody who
 8      has assumedly hired Westlaw Court Link to go get
 9      these and fight this fight.
10                    THE COURT:  You've indicated it
11      may not make a difference, but would it be since
12      -- Westlaw Court Express?
13                    MR. CONNOLLY:  Court Express, sir.
14                    THE COURT:  Would it be important
15      to know, given the assertion of the need for
16      protection, who the real party making the
17      request is?
18                    MR. CONNOLLY:  I think it would,
19      Your Honor.  I think what would happen is if the
20      real party was revealed, the particularized harm
21      would become crystal clear because as much as
22      you can guess off of the tea leaves of what
23      document is requested, we're going to find out
24      it's somebody who is in this business, in
```

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697   FAX (302) 658-8418

```
 1    competition with Agere, potentially involved
 2    with GE.
 3                    And again the particularized harm
 4    will become readily apparent.  I think that
 5    there has been a showing of particularized harm,
 6    absent whoever the requester is, that it doesn't
 7    need to matter who the requester is to have the
 8    harm.
 9                    So say it's, you know, someone
10    sitting in their home in Ohio and just decided
11    on a whim to get these documents.  You don't
12    need to show a harm because of that particular
13    situation.  The harm can exist through any means
14    because once they're out, they're out, and
15    anybody can use them.
16                    I think here, however, if we were
17    to find out who the real requester is -- first
18    of all, if the request was made, we might find
19    all this go away because they're not willing to
20    come up personally, or we'll see that the
21    particularized harm is very apparent.
22                    THE COURT:  So are you requesting
23    that the Court respond to Westlaw Court Express
24    with a request to advise who they are asking on
```

```
 1    behalf of?
 2                    MR. CONNOLLY:  I think, first off,
 3    again, regardless of who's asking, there is
 4    particularized harm with these documents that
 5    makes it moot from a sense of, it doesn't matter
 6    who's asking.  The harm is apparent.  They
 7    shouldn't be released.
 8                    If the Court is inclined to obtain
 9    more briefing or get more information about
10    these documents, I think the first step should
11    be to find out who's requesting because from
12    that point we can then, I think, focus on the
13    particularized harms to both Agere and GE, kind
14    of move away from the generalities of what may
15    happen, which is what these inquiries are
16    particularly about, to here is is exactly what
17    will happen if these things come out.
18                    Again I don't think it's necessary
19    from the standpoint of particularized harm
20    exists whoever that person is.  In some sense I
21    think this kind of time-consuming thing can go
22    away.
23                    THE COURT:  Reading the cases,
24    there are, you know, different sensitivities
```

1   that judges apparently have, and I was surprised

2   to see the range of decisions, and I thought

3   initially, well, maybe it's divided in trial

4   courts and appellate courts. But the range of

5   sensitivity was all over the place, and it

6   didn't really have a home in the trial courts or

7   the appellate courts.

8                   Some panels, I was surprised at

9   what they thought didn't deserve protection, as

10  well as I was surprised by some trial courts who

11  didn't seem to see the need for protection, as

12  well as on the other side of things, that the

13  requests that they thought should be

14  countenanced and provided protection.

15                  And so I'm just trying to

16  understand what's the best way. I mean, as you

17  read all the cases, it's really -- there's -- I

18  mean, there's not a really fixed standard.  It

19  really is subject to the circumstances of the

20  particular case, and it just seems to me that if

21  a competitor is trying to get access to what

22  they wouldn't want you to have access to if they

23  were in litigation, that kind of a reverse test,

24  it's a little easier to make a finding rather

1    than -- I think your words were "trying to read

2    the tea leaves," although because I appreciate

3    your general sense that, gosh, anyone that saw

4    this would know that there is implicit harm in

5    the release to the public.

6                I'm not so sure, on review, if

7    this thing got carried on, that that would be

8    enough.  I don't know if I'm making myself

9    understandable.

10               MR. CONNOLLY:  Absolutely, Your

11   Honor.  I think it would.  I think what might

12   help is if this goes beyond today --

13               THE COURT:  Wouldn't you like to

14   know if in this Circuit a competitor could get

15   that kind of information despite all the private

16   protections endorsed by the court protective

17   orders, that they felt that this presumption

18   that's a little bit of the language in one of

19   the cases, that once it's in the trial record,

20   it's out there?

21               MR. CONNOLLY:  I think, Your

22   Honor, that these are the kind of documents that

23   could stand the test of time absent knowing who

24   requested it, but, like I said, if we're

| | |
|---|---|
| 1 | inclined to move this beyond today, I think that |
| 2 | would be the first step, and it may well be that |
| 3 | it all goes away because that person is not |
| 4 | willing to say, "I'm the guy that did this." |
| 5 | If they do, we could get very |
| 6 | specific or particular about our particular |
| 7 | harm.  I think those -- that's the right way to |
| 8 | go if this goes beyond today, if this needs to |
| 9 | go beyond the points we've made in our letter or |
| 10 | the points I've made in front of you today. |
| 11 | THE COURT:  Well, you know, and I, |
| 12 | kind of, am empathetic to the idea that if I was |
| 13 | in the party's position here and somebody was |
| 14 | coming at me and the Courts were telling me, "If |
| 15 | it's public, it's public."  Well, whoever made |
| 16 | the request ought to be public too.  We all |
| 17 | ought to be public. |
| 18 | MR. CONNOLLY:  I agree, Your |
| 19 | Honor. |
| 20 | THE COURT:  We ought to be |
| 21 | transparent.  Transparency.  Put the light on |
| 22 | everything here. |
| 23 | All right.  Thank you. |
| 24 | MR. YOUNG:  Thank you, Your Honor. |

1    Good afternoon.  Dan Young from Townsend,

2    Townsend, and Crew representing Agere LSI.

3                    With respect to the documents that

4    are requested that Agere has objected to -- and

5    I understand and sympathize reading all these

6    cases and the various sensitivities that Courts

7    have given with respect to various documents --

8    one thing they've been uniform on, no dispute as

9    to, is that trade-secret information has always

10   been protected as a baseline rule.  In other

11   words, if it's trade secret it has protection

12   within the courts of both the District of

13   Delaware and the Third Circuit.

14                    THE COURT:  That's why I was

15   asking.  I had a Coke case, and their formula

16   was so jealously guarded.

17                    So I do agree with you that

18   forever they protected trade secrets.  It gets a

19   little dicy when it's governing agreements.

20                    So I think we can all agree on

21   trade secrets.  That's an easy one.

22                    MR. YOUNG:  Yes, Your Honor.

23                    I have no view as to whether GE's

24   documents are trade secrets.  I can't argue to

```
1    that.
2                    As far as Agere's documents, they
3    are unquestionably trade secrets.  I will be
4    able to speak to these documents.  If Your Honor
5    would like more specific testimony from Agere
6    itself, we have Mr. Surinder Rai and Mr. Dwight
7    Kempf here who can speak to any of your
8    questions about the trade-secret status of these
9    documents.
10                   THE COURT:  Why don't you make a
11   proffer of what they would say to ease the
12   process.  I think it's good to have that in the
13   record.
14                   MR. YOUNG:  Yes, sir.  These
15   documents are incredibly important to Agere.  We
16   have gone out of our way to get witnesses here
17   to speak to them, but I will proffer to what
18   they would say, but if Your Honor has any
19   further questions, we could have them take the
20   stand, and they could give you any additional
21   information you would like.
22                   With respect to the first category
23   of the documents, I'll speak to JTX 16, which is
24   the modem profit-and-loss statement of Agere
```

| | |
|---|---|
| 1 | over numerous years.  This document is |
| 2 | incredibly important and a trade secret.  It is |
| 3 | confidential financial information that has |
| 4 | very, very detailed specifications, detailed |
| 5 | both with respect to the costs, all the various |
| 6 | costs that Agere has in this business, and the |
| 7 | profitability or margin for all its products. |
| 8 | If this document is released to |
| 9 | anybody, then the public has access to exactly |
| 10 | how Agere runs its modem business.  As an |
| 11 | example, if I were a competitor and had this |
| 12 | document, I could know pricing points.  I could |
| 13 | know market strategies.  I could find a way to |
| 14 | undercut the price because I know exactly how |
| 15 | much it costs Agere to make its various modems. |
| 16 | So the harm would be significant. |
| 17 | In addition, if I were a party |
| 18 | like GE who has patents with a license, that can |
| 19 | drive negotiations.  So it would be incredibly |
| 20 | detrimental to Agere that that information would |
| 21 | be released to the public. |
| 22 | So for the trade-secret |
| 23 | perspective, it's confidential financial |
| 24 | information, and it would be and it is kept |

1       secret within Agere.  Not everybody at Agere can
2       get access.
3                       I proffer that if I put Mr. Rai on
4       the stand, he would say that only senior
5       management can get this information and only if
6       they have a specified purpose for why they are
7       asking for it.  It's financial information,
8       confidential.  It's kept confidential within
9       Agere, so it's a trade secret.
10                      And under the standard of the
11      Federal Circuit, it's the type of information
12      that Courts would protect, trade secret, and it
13      would be incredibly harmful and detrimental to
14      Agere if it were given to the public.
15                      Again this was information that
16      was produced under the protective order marked
17      "Attorney's eyes only."
18                      That's the first document, so it
19      would be accounting information.  That's JTX 16.
20                      The next document, JTX 52, is the
21      sales data for every single Agere modem within
22      the various categories of product numbers from
23      2001 through 2008 by quarter, by product, by
24      customer.  This information, I would also

```
1    proffer Mr. Rai would testify, is a trade
2    secret.
3              It has confidential pricing
4    information.  All the Courts, Delaware and Third
5    Circuit, have always said that price lists,
6    pricing information, and customer information
7    are trade secrets under the law.
8              This exhibit, JTX 52, gives you
9    pricing information, and it gives you how much
10   of each product the customer purchased, and it
11   goes all the way through the history.  If you
12   had this document and you were a competitor, you
13   could see that Customer X purchased this amount
14   in 2001, 2002, 2003.
15             It would show you how the
16   progression of the relationship between Agere
17   and various customers progressed over time.
18             It would talk about all the
19   different pricing strategies that Agere has with
20   its modems by both the modem type and the modem
21   customer.
22             This is incredibly confidential
23   information that would give you a road map to
24   exactly what Agere's business is with respect to
```

1    modems, so if it fell in the hands of a
2    competitor or a licensing entity or if it was
3    put on the internet, it would be incredibly
4    detrimental to Agere if this information were
5    exposed.
6                Again this information is pricing.
7    It is a trade secret, and it would be incredibly
8    harmful if this information was released to the
9    public.  That's the second.
10                The first category was financial
11   information.  The second category was sales
12   data.
13                The third category, which is a
14   number of exhibits that starts at DX 284 and
15   goes to PPX 38, PPX 39, PPX 40, PPX 41, PPX 42,
16   PPX 43, PPX 44, and PPX 45, that is -- each one
17   of those exhibits is a yearly listing of every
18   Agere shipment of every one of its modem
19   products.
20                What that information shows is, it
21   has every single Agere customer, and it also
22   lists -- as the Court may recall from the trial,
23   it lists both the ODM, original distribution
24   manufacturer, and then the ultimate customer, so

```
 1      it also shows a relationship between what
 2      ultimate customer -- which company they are
 3      using to manufacture their boards, so it
 4      establishes that relationship, which is also
 5      highly confidential.
 6                  So again this information gives
 7      you all the customers.  It gives you all the
 8      products, and it gives you pricing and volume
 9      information.  Again this is Agere's entire
10      business if this was given out.
11                  If you recall, these documents are
12      incredibly detailed.  They're produced in
13      electronic form.  They can be manipulated by a
14      third party, and they are also thousands and
15      thousands and thousands of lines long, many
16      times over eight thousand lines.
17                  Every time Agere ships a modem,
18      it's included in that.  Again it's per se trade
19      secret information.  I proffer to say both with
20      respect to the sales data and this shipment data
21      -- when I say "shipment data" I mean DX 284
22      through PPX 38 through 45 -- all of that is
23      trade secret.  It's customer lists, pricing
24      lists again.  It's a road map to their business,
```

1    and it would be highly prejudicial if that
2    information got out to the public or to any
3    entity.
4              That covers the second -- or the
5    third category of documents. Again those are
6    all trade secrets. Every Court has uniformly
7    said that trade secret is protected and widely
8    acknowledged by the Third Circuit. All that
9    information was marked "Attorney's eyes only"
10   under the protective order in this case.
11             The fourth category of documents
12   are JTX 53 and 54. If you recall, Your Honor,
13   the parties had agreed to allow the jury to show
14   the damage calculations. These two are with
15   respect to GE's damage expert, Miss Julie Davis.
16   She had two different theories of damages, and
17   this information shows by year the total number
18   of modems she believes the information should be
19   applied to.
20             Now, our objections to these
21   documents is if you had these documents and you
22   had the transcript, you could pull out from that
23   Agere's total sales per year of both its hard
24   and soft modems.

```
 1              The breakdown between hard and
 2     soft modems is confidential, as well as the
 3     total sales numbers, and what it would show to a
 4     competitor is, it shows trends because it has
 5     information from 2001 all the way to 2008.  It
 6     can show how the differences between hard and
 7     soft modems changed over time again.
 8              That is confidential information
 9     that I proffer to you that Mr. Rai would testify
10     is not generally known to the public and would
11     be harmful to Agere if it came to a competitor
12     or party that was trying to license intellectual
13     property to Agere because you could derive from
14     that document Agere's total sales numbers and
15     how it progressed over time with the breakdown
16     between hard modems and soft modems.
17              The next category of documents,
18     Your Honor -- we noted this in our letter -- are
19     demonstrative exhibits only, PDX 91 through PDX
20     97.
21              As we noted in the letter, there's
22     a question in our mind whether these documents
23     are, quote, judicial records.  They were never
24     admitted into evidence.
```

```
 1                    THE COURT:  I can help you out
 2      there.  They're not, and we make that clear
 3      here, that demonstratives are used in the
 4      courtroom for the aid of the jury, but they're
 5      not admitted into the record, so they are not
 6      court documents.
 7                    MR. YOUNG:  Those are no longer an
 8      issue.
 9                    The last document that we have,
10      Your Honor -- and we noted this in our letter as
11      well -- the requester, Ms. Bonner, requested a
12      PPX 488, which is the last document put on her
13      letter.
14                    As we noted in our opposition,
15      there is no document PPX 488 that was admitted
16      at trial.  We, upon filing these letters,
17      provided these letters as a courtesy to
18      Ms. Bonner on July 29th, so she was aware of our
19      notation that this is not an exhibit that was
20      admitted in trial, and she has not, to our
21      knowledge, ever amended her request to request
22      any other exhibit, so we believe that there's
23      not an adequate request for any document PPX
24      488.
```

|   |   |
|---|---|
| 1 | However, as an abundance of |
| 2 | caution, we put in our letter that she might |
| 3 | have -- we don't know one way or the other -- |
| 4 | been requesting PPX 448, and that, Your Honor, |
| 5 | is a fair-market evaluation that LSI engaged |
| 6 | Deloitte and Touche to perform over Agere as |
| 7 | part of its merger transaction with Agere, and |
| 8 | we have Mr. Dwight Kempf here from Agere who is |
| 9 | very familiar with the document and can give you |
| 10 | particularized testimony about how harmful that |
| 11 | is to Agere. |
| 12 | I'll proffer that he'll say the |
| 13 | following: The first, that document is an |
| 14 | evaluation of every single business that Agere |
| 15 | is in. It analyzes all their costs, and it |
| 16 | analyzes their revenue, and it projects, on a |
| 17 | cash-flow basis, how much that business should |
| 18 | be valued over time. |
| 19 | This document is a blueprint not |
| 20 | only of Agere's modem business as the other |
| 21 | documents were, but it's a blueprint of Agere's |
| 22 | entire company. |
| 23 | This document is a manifestation |
| 24 | of numerous interviews that Deloitte and Touche |

1    engaged all of Agere's employees over every
2    single aspect of its business:  Finance,
3    production, manufacturing, sales, and all its
4    business models.  It has confidential
5    information from every single aspect of Agere's
6    company, and then it performed these evaluations
7    on that information.
8              The document is -- has a valuation
9    date in 2007, but the document is still highly
10   confidential as of today.  With information
11   that's available through public filings with the
12   SEC, any kind of competitor could get the
13   document, compare it to the publicly available
14   information, and assess how Agere's business is
15   doing, where it's going.  It could analyze the
16   synergies of the agreement of the underlying
17   merger between LSI Agere and see how those have
18   progressed over time.
19             It would be allowing a competitor
20   to have full access to Agere, all its
21   businesses, and be able to make independent
22   assessments of the business.
23             And from a competitor's
24   standpoint, as an example, if it was in a

```
 1    particular business that Agere was involved

 2    with, they could look at the information in this

 3    document.  They could assess how profitable

 4    Agere's business is.  They could try to undercut

 5    them on sales.  They could find out customer

 6    information.  They could essentially have

 7    incredible intelligence about Agere's business,

 8    and, quite frankly, how LSI's business, when the

 9    two were separate companies -- how the two

10    interact with each other.

11                  Again it's an incredibly important

12    document to Agere.  It's a trade secret.  This

13    document is not widely distributed within Agere

14    at all.  In fact, I will proffer to you that

15    Mr. Kempf would say that it takes a great deal

16    of effort to get this document.  Only certain

17    people in the finance department can get it, and

18    only if they have a particularly good reason to

19    look at it.

20                  Again this document is clearly a

21    trade secret, and it would be incredibly harmful

22    if it were released to anybody.

23                  I know you had a statement and

24    questions about whether this depends on who the
```

1      requesting party is, and I would say, at least

2      with respect to Agere's documents, it is

3      incredibly harmful no matter who it's released

4      to.

5                    All of these documents were under

6      the protective order in this case, and if these

7      were released to outside, then the horse is out

8      of the barn with respect to all this

9      information, particularly with respect to

10     Agere's modem business, and this last document,

11     448, if that's what Ms. Bonner is looking for,

12     that is with Agere's entire business.

13                   These are all the trade secrets.

14     There is no question these are protectable, both

15     in District Court with cases here, and also with

16     respect to the Third Circuit.

17                   Your Honor, I think pending any

18     questions you have, I think that describes the

19     various categories of documents.

20                   And, Your Honor, just to make sure

21     the record is clear, I know this is effectively

22     done with the letters themselves, but as a

23     relief, we are asking the Court to enter a

24     protective or confidentiality order over these

| | |
|---|---|
| 1 | documents so they cannot be released. |
| 2 | And if the Court were to be |
| 3 | inclined to produce any of these documents, we |
| 4 | would respectfully ask the Court to stay its |
| 5 | order so we could evaluate any potential relief |
| 6 | we could get on behalf of the Third Circuit. |
| 7 | Again these are sensitive |
| 8 | documents.  We have brought witnesses from Agere |
| 9 | who can answer any particular questions Your |
| 10 | Honor may have to ask about the documents beyond |
| 11 | the proffer I've just given. |
| 12 | THE COURT:  All right.  Thank you. |
| 13 | If I were to order any of the |
| 14 | documents, I would indicate my order and the |
| 15 | reasons and then give you an opportunity to |
| 16 | appeal it -- |
| 17 | MR. YOUNG:  Thank you. |
| 18 | THE COURT:  -- without providing |
| 19 | to the requester. |
| 20 | MR. YOUNG:  Thank you. |
| 21 | THE COURT:  Okay. |
| 22 | Is there anything else for -- |
| 23 | MR. CONNOLLY:  If I can just add |
| 24 | one quick thing, Your Honor? |

```
 1              We also have from potential
 2    witnesses from GE as well.  My earlier statement
 3    about the documents can be thought of as a
 4    proffer from Kenneth Glick from GE as well.
 5              THE COURT:  I'll accept them as
 6    that.
 7              MR. CONNOLLY:  One other thing
 8    that Mr. Young's statement made me think of is
 9    that many of our documents -- and certainly we
10    would consider them trade secrets as well.
11              GE's business is different than
12    Agere's in this situation, and the particular
13    documents that have been requested from GE go
14    straight to how GE conducts its business, the
15    particulars of that.  Highly sensitive trade
16    secrets.
17              The operating agreement itself,
18    there's many parts of that, but there's an
19    attachment to it that literally
20
21
22
23    That's why it's kept highly confidential.
24    That's why it's sensitive to GE and why it's
```

| | |
|---|---|
| 1 | treated as such within this case. |
| 2 | And toward that end with some of |
| 3 | these other documents, they are broad documents. |
| 4 | They go not just to the issues brought up in |
| 5 | this case, not just to the specific portions of |
| 6 | those documents brought up in this case, but to |
| 7 | other portfolios that GE owns and particulars |
| 8 | relating to those. |
| 9 | I think this is a case where |
| 10 | you've got documents that, wholesale, should |
| 11 | never be released, even if that's the ultimate |
| 12 | decision, because portions of those documents |
| 13 | weren't at issue in this case, were never |
| 14 | intended to be, and weren't discussed in any |
| 15 | way. |
| 16 | THE COURT: All right. Okay. |
| 17 | What I'm going to do is take it |
| 18 | under advisement, and I am going to determine |
| 19 | whether it's appropriate to send a response to |
| 20 | the requester saying that there's been an |
| 21 | assertion of trade secret and confidentiality |
| 22 | and a request that a protective order be entered |
| 23 | as to the documents, and in order to balance and |
| 24 | assess the request against that assertion, it |

```
1    would be helpful to know the identity of the
2    real party making the request.
3                    If I decide not to do that, then
4    I'll address the request directly and either
5    grant it, deny it, grant it and deny it in part.
6    Whatever I do there, though, I'll be certain
7    that nothing is turned over if there is a
8    release order that wouldn't give you the
9    opportunity without the documents going over to
10   appeal.
11                   MR. YOUNG:  Your Honor, may I ask
12   one question?  One more thing on the record.
13                   One thing that may be appropriate,
14   Your Honor, for your consideration is if you
15   were to deny the -- or to grant the protective
16   order in this case, if you were concerned about
17   the identity of the ultimate requester of those
18   documents, as part of your analysis, one thing
19   Your Honor could do is grant the protective
20   order.
21                   Then if they want to challenge
22   that, which they could theoretically do, they
23   could try to intervene in the case for the
24   purposes of challenging the protective order,
```

```
 1    and through that process, they would identify
 2    who they were.
 3               THE COURT:  I could let them do it
 4    after the decision and the Freedom of
 5    Information Request is denied, and they come in
 6    formally.
 7               MR. YOUNG:  That way you can deny,
 8    and if they truly want these documents and they
 9    think they have a basis to do it, they could try
10    to intervene.
11               THE COURT:  I think you know who
12    it is.  You're just not telling the rest of us.
13               MR. YOUNG:  Your Honor, I have no
14    idea who the party is.
15               THE COURT:  You don't have to
16    answer that.
17               Thank you very much.  This has
18    been helpful.
19               THE CLERK:  All rise.
20               (Proceeding ended at 4:18 p.m.)
21
22
23
24
```

```
 1              C E R T I F I C A T I O N

 2                    I, DEANNA WARNER, Professional

 3       Reporter, certify that the foregoing is a true

 4       and accurate transcript of the foregoing

 5       proceeding.

 6                    I further certify that I am

 7       neither attorney nor counsel for, nor related to

 8       nor employed by any of the parties to the action

 9       in which this proceeding was taken; further,

10       that I am not a relative or employee of any

11       attorney or counsel employed in this case, nor

12       am I financially interested in this action.

13

14

15              _____

16                    DEANNA WARNER

17

18

19

20

21

22

23

24
```